**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF INDIANA**
**INDIANAPOLIS DIVISION**

| | | |
|---|---|---|
| **LINDA CARLISLE,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Cause No. 1:10-cv-490-WTL-MJD** |
| | ) | |
| **DOLGENCORP, INC., *et al.*,** | ) | |
| | ) | |
| **Defendants.** | ) | |

**ENTRY ON DOLGENCORP, INC.'S MOTION FOR SUMMARY JUDGMENT**

This cause is before the Court on Defendant Dolgencorp, Inc.'s motion for summary judgment. The motion is fully briefed, and the Court, being duly advised, **DENIES** Dolgencorp, Inc's motion for the reasons set forth below.

## I. STANDARD

Federal Rule of Civil Procedure 56(a) provides that summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." In ruling on a motion for summary judgment, the admissible evidence presented by the non-moving party must be believed and all reasonable inferences must be drawn in the non-movant's favor. *Hemsworth v. Quotesmith.com, Inc.*, 476 F.3d 487, 490 (7th Cir. 2007); *Zerante v. DeLuca*, 555 F.3d 582, 584 (7th Cir. 2009) ("We view the record in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor."). However, "[a] party who bears the burden of proof on a particular issue may not rest on its pleadings, but must affirmatively demonstrate, by specific factual allegations, that there is a genuine issue of material fact that requires trial." *Id.* Finally, the non-moving party bears the burden of specifically identifying the relevant evidence of record, and "the court

is not required to scour the record in search of evidence to defeat a motion for summary judgment." *Ritchie v. Glidden Co.*, 242 F.3d 713, 723 (7th Cir. 2001).

## II. FACTUAL BACKGROUND

The facts taken in the light most favorable to the Plaintiff are as follow.[1]

### A. Dollar General

This case arises out of Plaintiff Linda Carlisle's employment with Defendant Dolgencorp, Inc., which operates Dollar General stores. Dollar General is a retailer of basic consumable goods, items that are frequently used and replenished by consumers, including cleaning supplies, health and beauty aids, foods/snacks, housewares, toys, and basic apparel. As of 2005, Dollar General operated approximately 7,500 stand-alone Dollar General stores in 30 states, with an average annual sales volume over $1 million per store.

Dollar General operates its stores according to, among other things, Standard Operating Procedures ("SOPs"). Employees on staff at individual stores include a Store Manager, Assistant Store Manager ("ASM"), a Lead Clerk, and multiple store clerks. Store Managers report to a District Manager ("DM"). DMs supervise fifteen stores on average, but may supervise as many as twenty-five stores. Dollar General expects that DMs will visit each store every four to six weeks. DMs typically do not have keys to the stores in their districts.

Dollar General typically relies on each Store Manager to implement and enforce the Company's policies and procedures in his or her store. It is the Store Manager's responsibility to

[1] Defendant Dolgencorp, Inc. was Carlisle's former employer. Effective October 9, 2008, Dolgencorp, Inc. was converted to a limited liability corporation and is now Dolgencorp, LLC. Dolgencorp of New York, Inc., Dolgencorp of Texas, Inc., and Dollar General Partners were not Plaintiff's former employer. Because these other Defendants are separately contesting personal jurisdiction and venue, they did not join in Dolgencorp, Inc.'s motion for summary judgment.

implement Dollar General directives in her store, which may include performing the required work herself.

Store Managers are paid weekly on a salary basis. In addition, Store Managers and ASMs are eligible for certain annual bonuses. These bonuses are tied to the financial and operational performance of the Store Manager's own store and individual performance, rather than the company's overall profits. During Carlisle's tenure as a Store Manager, the highest bonus an ASM could receive was 30% of the Store Manager's bonus eligibility.

**B. Carlisle's Job Duties**

Plaintiff Linda Carlisle was hired as a sales associate at Dollar General Store No. 701 in Charlestown, Indiana, in 1981. Approximately one year later, Carlisle applied for the position of Store Manager. Carlisle competed against six or seven other applicants for the position. Ultimately, the store DM told Carlisle that there was a stock room full of merchandise that was left over from the previous manager, and if Carlisle could "get all this out in a week and get everything going," then the job was hers. Carlisle met the challenge and was promoted by her DM. Carlisle remained employed as the Store Manager of Store No. 701 until January 2003. According to Carlisle, the following statement in the Store Manager Job Description represents a general summary of her job as a Store Manager: "responsible for the management of all employees in the effective planning and implementation of all store processes including ordering, receiving, stocking, presentation, selling, staffing and support."

As Store Manager, Carlisle participated in the hiring process for her store. First, Carlisle obtained DM approval to accept applications. Carlisle then reviewed and evaluated job applications, selected candidates to interview, conducted the interviews, ordered background

checks for prospective hires, and then made a hiring recommendation to her DM as to whom she wanted to hire. Carlisle did not make recommendations concerning a new employee's starting rate of pay, as all employees began earning minimum wage. Carlisle also collected new hire paperwork from new store employees, including tax and immigration compliance forms and acknowledgments of company policies. From 2001 through January 2003, Carlisle received approval from her DM to hire at least thirteen people. Carlisle was also responsible for making termination recommendations to her DM.

In addition, Carlisle made recommendations to her DM regarding pay rates and advancement for her employees. Carlisle recommended the promotion of several employees to sales associate and/or to ASM during her employment, and her recommendations for promotion were never rejected by her DM.

Carlisle managed her store's controllable expenses. Since 2000, Carlisle had an average of 257 labor budget hours per week to apportion among the staff at her store (or the equivalent of 6.4 full-time employees). Carlisle testified that payroll was her store's biggest controllable expense. Part-time employees were only allowed to work a certain number of hours, and if they were scheduled to work more than that set amount, DM approval was required. Thus, one of Carlisle's objectives as Store Manager was to train and develop employees in order maximize the store's labor budget. Carlisle credits her store's increase in annual sales in part to the fact that she controlled expenses.

Dollar General controlled the placement of merchandise in Carlisle's store through a planogram,[2] and even the backroom was "planogrammed." Dollar General also provided monthly planners that dictated the display of seasonal merchandise. At times Carlisle made adjustments to her store's planograms, since they did not always fit properly in her store. Carlisle decided what merchandise to display in her store's "flex space," which comprised less than five percent of store space, and end caps that were designated as "manager's choice." When merchandise was damaged, DM approval was always required before the price of that merchandise could be marked down. Carlisle also lacked the authority to transfer merchandise to or from the store to another store.

Carlisle enforced Dollar General's policies on a day-to-day basis and answered questions about company policies. Carlisle ensured that employees knew, understood, and followed pay policies and anti-discrimination policies. However, when issues such as FMLA leave arose, Carlisle contacted her DM. Carlisle also contacted her DM for approval to use her own vacation time.

It was up to Carlisle to train, supervise, and direct her employees to ensure that they completed all the necessary tasks to profitably run her store. For example, Carlisle apportioned work among her employees to follow the Dollar General guidelines dictating what new merchandise should be stocked first. Carlisle testified that she scheduled her store to ensure that she had the right people to process her store's bi-weekly truck delivery. On "truck day," when she scheduled most of her employees to be present, Carlisle monitored the progress of their work

[2] "Planogram" is a retail term for a diagram used as guide for the placement of products throughout a store.

throughout the day and assigned tasks to her employees in order to meet Dollar General's timeline that merchandise go from "door to floor in twenty-four." Carlisle apportioned the work among her employees in a manner so as to improve the condition of her store, but the biggest part of her day consisted of stocking merchandise. In fact, Carlisle spent 80% of her time performing the same clerical or manual labor tasks done by other employees (e.g., cleaning and stocking). Carlisle explained that she decided it was in the best interest of her store to use her time to perform those tasks as opposed to delegating them to others. Moreover, Carlisle could not have performed all the necessary manual labor by herself and had to rely on delegating these tasks to her employees. Regardless, even when Carlisle was overseeing the unloading of the truck deliveries, she still managed and oversaw the front end of her store.

Carlisle conducted annual performance reviews for sales associates, lead clerks, and the ASM at her store, which required her to assess several different categories of performance based on her daily supervision of those employees. Thereafter, Carlisle met on an individual basis with her employees to provide feedback. Carlisle was not required to speak with her DM before she completed the written evaluations or before she met with an employee regarding an evaluation, but she was required to obtain DM approval before writing up a store employee. In addition to formal reviews, Carlisle regularly provided coaching regarding her employees' job performance.

As the Store Manager, Carlisle taught her ASM how to assist her as the Store Manager. After the promotion or hire of an ASM, Carlisle determined what and when she could delegate to her ASM. Even when Carlisle delegated some of her managerial responsibilities to her ASM or her ASM performed them in Carlisle's absence, Carlisle still remained ultimately responsible for

her store. Overall, the company relied on Carlisle to ensure that her store team was properly trained.

Carlisle agrees that she had a much greater level of responsibility than her ASMs and that, as the Store Manager, she was always "in charge" of her store. Carlisle's ASMs did not interview or hire, discipline or terminate, or prepare performance evaluations related to other employees. When Carlisle evaluated her ASMs, she did not evaluate them on the overall operation of her store, but rather on how well they individually contributed to Carlisle's operation of the store.

Carlisle testified that she referred to Dollar General's SOPs when she could not reach the DM, whom she called first when she needed instruction. It was usually easier for Carlisle to call the DM because, most of the time, she needed to notify the DM of the situation anyway. For example, when an employee was injured in the store, Carlisle had to contact the corporate office to find out what paperwork to fill out. Similarly, if bad weather threatened, Carlisle was required to get DM approval to close the store.

During Carlisle's employment, nearly all of her DMs visited her store from roughly once every two weeks to once a month. Carlisle's last DM visited her only once every other month. Carlisle testified that the amount of time that she interacted with her DMs in her store was between one and two hours a month. Carlisle also testified that she spoke on the telephone with her DMs approximately 30 minutes a week.

**C. Carlisle's Job Performance**

Carlisle believes that she performed "extremely well" as a Store Manager and that her store was "highly profitable." In fact, during her tenure as Store Manager, Carlisle grew her

store's annual sales from $.5 million to approximately $2.3 million. More specifically, from 1997 to 2002, Carlisle's store made the following annual sales: $1.5 million in 1997; $1.8 million in 1998; $1.9 million in 1999; $2.089 million in 2000; $2.2 million in 2001; and $2.3 million in 2002.

Likewise, Carlisle's salary increased over time: she earned weekly salaries of $624 in 2001; $642.71 beginning April 2001; $675 beginning August 2001; $695.25 beginning April 2002; and $750 beginning November 2002.[3] Whether as a result of the number of hours worked, acquired retail experience, tenure with the company, or some other factor, Carlisle was paid more than twice the wages–not including her bonus–of the next highest paid employee at her store. Carlisle agreed that she earned "significantly more" than the other employees in her store. In addition to her salary, Carlisle was eligible to earn bonuses based on her store's annual results in sales, profitability, shrink level, expenses, and inventory turnover. During her tenure as Store Manager, Carlisle earned several bonuses: $18,097 in 2000; $20,458 in 2001; and $21,937 in 2002.[4]

Carlisle's performance was evaluated with respect to her store's sales volume, expenses, inventory shrink, in-stock level, the training and development of her employees, customer satisfaction, and safety awareness in her store. Her performance in these areas impacted the overall operation of her store and demonstrated her strength in training her employees.

---

[3] Salary figures predating 2001 were not provided to the Court.

[4] When Carlisle first became a Store Manager, Dollar General did not give bonuses to Store Managers.

**D. How Carlisle Spent Her Time**

At the onset of her employment as a salaried Store Manager in 1996, Carlisle executed an "Exempt Certification," whereby she represented, among other things, that she spent at least 51% of her time each week in "exempt management/supervisory functions." Throughout her tenure as a Store Manager, Carlisle worked an average of 52.5 hours per week as a Store Manager, at least 32 hours of which was spent performing managerial duties.

For example, Carlisle testified that she spent eight hours per week planning the work to be done, determining how work was to be done, setting the weekly schedule and assigning work hours to employees, and preparing and transmitting payroll. Carlisle spent an additional three hours per week setting and monitoring daily to-do lists, directing the work of her employees, and giving guidance to her employees.

Twice per week Carlisle supervised the ordering of all merchandise for her store. Carlisle spent eight hours per week ordering merchandise, including determining the appropriate quantities and merchandise to be ordered and sold.

Carlisle testified that she spent ten hours per week on the managerial functions of controlling the flow of merchandise, including the receiving of merchandise. This task included facilitating the efficient staging, stocking and storage of merchandise and ensuring that all merchandise was presented according to established Dollar General practices.

Carlisle spent one hour per week providing a safe work environment, including ensuring compliance with all company safety policies. Carlisle also spent one hour per week ensuring Dollar General policies and guidelines were followed by all employees. Carlisle spent one hour

per week preparing and making deposits, transmitting daily sales information, and preparing and checking store paperwork.

Carlisle spent additional time performing the following managerial tasks: taking applications, reviewing applications, interviewing, checking references, selecting, and making job offers, all with the DM's approval; setting up new employees on payroll, orientation and training of new employees, and training and on-going development of new employees; and making recommendations for adjustments to pay rates, conducting performance reviews, and monitoring performance for the purpose of making recommendations for any change of work status.

Carlisle testified that she was the leader of her store, had responsibility for everything in it, and was the person "in charge" of the store on a day-to-day basis. In addition, Carlisle testified that she remained ultimately responsible for what happened in her store, regardless of whether she delegated some of her managerial duties or some of those duties were performed at her discretion in her absence.

## III. DISCUSSION

Carlisle argues that she is entitled to overtime compensation for hours she worked while a Store Manager. In response, Dolgencorp argues that Carlisle is an "exempt" employee not entitled to overtime compensation.

The Fair Labor Standards Act provides that eligible employees shall receive compensation for services in excess of forty hours in a workweek at a rate not less than one and one-half times the regular rate. 29 U.S.C. § 207(a)(1). However, employees employed in a "bona fide executive, administrative, or professional capacity" are excluded from § 207. 29 U.S.C. §

213(a)(1). "The application of an exemption under the [FLSA] is a matter of an affirmative defense on which the employer has the burden of proof." *Corning Glass Works v. Brennan*, 417 U.S. 188, 196-97 (1974).

The FLSA was amended effective August 23, 2004. As all workweeks at issue occurred prior to this date, the preamendment regulations are applicable to Carlisle's claims.[5] *See Kennedy v. Commonwealth Edison Co.*, 410 F.3d 365, 369 (7th Cir. 2005) (explaining that the 2004 amendment definitions do not apply retroactively). The pre-amendment regulations set forth a six-part test (the "long test") and a three-part test (the "short test") for determining whether the executive exemption applies to an employee. 29 C.F.R. § 541.1(2003). The "short-test" applies to an employee who earns not less than $250 per week. 29 C.F.R. § 541.1(f) (2003). The parties do not dispute that Carlisle earned more than $250 per week at all times relevant to this action. Therefore, the short test may be used.

Under the short-test, the employer must prove that (1) the employee is paid on a salary basis; (2) she regularly directs the work of two or more other employees; and (2) her primary duty is the management of the employer's enterprise. 29 C.F.R. § 541.1(f) (2003); *Jackson v. Go-Tane Services, Inc.*, 56 Fed.Appx. 267, 270 (7th Cir. 2003). Courts narrowly construe the exemption and apply it only where an employee "plainly and unmistakably comes within the statute's terms and spirit." *Arnold v. Ben Kanowsky Inc.*, 361 U.S. 388, 390 (1960).

The undisputed evidence clearly establishes elements one and two of the short-test

---

[5] Carlisle argues that, before deciding whether Carlisle falls within the exemption generally, the Court must determine whether she is a "blue-collar worker" within the meaning of 29 C.F.R. 541.3(a), which specifically excludes blue-collar workers from the overtime exemption. This section amended the FLSA effective August 23, 2004, more than a year and a half after Carlisle's employment with Dollar General ended, and is therefore inapplicable.

exemption inquiry. Thus, the question before the Court is whether management was Carlisle's primary duty.

**A. Primary Duty Rule of Thumb**

"In the ordinary case it may be taken as a good rule of thumb that primary duty means major part, or over 50 percent, of the employee's time. Thus, an employee who spends over 50 percent of [her] time in management would have management as [her] primary duty." 29 C.F.R. § 541.103 (2003). While Dolgencorp argues that Carlisle spent roughly 60% of her time performing management duties, Carlisle argues that she spent 80% of her time performing non-management duties. Dolgencorp derives its figure from dividing Carlisle's testimony as to the average hours she performed management duties per week (32) by what she reported as her average hours worked per week (52.5), while Carlisle reports her figure based on her personal perception. Carlisle does not dispute the accuracy of Dolgencorp's figures and acknowledges that her own figure conflicts with Dolgencorp's;[6] however, Carlisle testified during her deposition that during those 32 hours, she may have been doing other non-managerial duties essentially at the same time. For example, while directing her employees on "truck day," Carlisle may have been unloading boxes herself. The fact that Carlisle was multitasking offers an explanation that reconciles the 40% overlap between the parties' conflicting figures. However, as the amount of time spent performing managerial duties in this case is virtually inseparable from

[6] Carlisle assumes that this figure is based on an erroneous Dollar General survey conducted in 2004 and provides an expert report challenging the scientific validity of the survey. The figures Dolgencorp relies on, however, reflect adjustments made to the original survey data during Carlisle's deposition. For example, the expert report faults the survey for requiring the assessment of hours worked to total 45 hours; at her deposition, counsel adjusted the average total hours worked in a week to 52.5 based on Carlisle's testimony as to the actual numbers of hours she worked. Counsel then went through each sub-category of work type and asked Carlisle to confirm or modify the original hours she reported with regard to each category.

the amount of time spent performing non-managerial duties, the "rule of thumb" is inapplicable here. *See* 29 C.F.R. § 541.103 (2003) (explicitly contemplating situations in which an employee may perform managerial and non-managerial duties simultaneously and looking to "other pertinent factors" to determine whether the employee's primary duty was management).

"Time alone, however, is not the sole test, and in situations where the employee does not spend over 50 percent of his time in managerial duties, he might nevertheless have management as his primary duty if other pertinent factors support a conclusion." 29 C.F.R. § 541.103 (2003). As the evidence is inconclusive as to whether Carlisle spent more than fifty percent of her time performing managerial duties because she may have simultaneously been performing non-managerial duties, the Court turns to "other pertinent factors" to determine whether Carlisle's primary duty may nevertheless be management.[7]

**B. "Other Pertinent Factors" Test**

Other factors pertinent to the primary duty inquiry include (1) the relative importance of the managerial duties as compared to other types of duties; (2) the frequency with which the employee exercises discretionary powers; (3) [her] relative freedom from supervision; and (4) the relationship between [her] salary and the wages paid other employees for the kind of nonexempt work performed by the supervisor. 29 C.F.R. § 541.103 (2003). Importantly,

---

[7] The Plaintiff erroneously argues that, because she "spent 80% of her time performing nonmanagerial duties, as a rule of thumb she had a primary duty of performing nonmanagement work." This argument ignores the plain language of the regulation section. While a "rule of thumb" that an employee has management as her primary duty comes into play when an employer performs managerial duties more than 50% of the time, no opposite rule of thumb arises when an employee spends more than 50% of her time performing nonmanagerial duties. The section explicitly contemplates situations where, even though management duties are performed less than 50% of the time, the employee may still have management as her primary duty if other pertinent factors so indicate.

Dolgencorp must establish by a preponderance of the evidence the primary-duty element as a whole, not each individual factor relevant to that inquiry. *Thomas v. Speedway SuperAmerica, LLC*, 506 F.3d 496, 505 n.6 (6th Cir. 2007).

*1. Relative Importance of Managerial Duties*

Dolgencorp argues that there is only one reasonable conclusion to be drawn about the relative importance of Carlisle's management duties: Carlisle's management duties were the most important because, without Carlisle, the store would cease to function. In response, Carlisle explains that, while it is true that the managerial duties she performed were important, they were not the *most important* because of the company's low-price business model.

It is true that Carlisle performed duties critical to the functioning of her store: she was the only person who made plans, gave directions, prepared the schedule, and monitored completion of the assignments she gave to others, and it is hard to argue with Dolgencorp's contention that one cannot "insert a leaderless team of unscheduled, untrained and largely unaccountable manual laborers into the store and, with only brief and irregular DM visits, expect similar success." Yet Carlisle makes an important point: Dollar General's low-price business model requires manual labor costs be kept to a minimum and the labor budget allocated to each store manager is not adequate to keep the store functioning at its expected level. Carlisle argues that Dollar General makes up for this shortfall by designating one employee as "exempt" from overtime pay and then tying that employee's salary and bonuses to the success of the store. Because this employee's salary and bonuses are integrally linked with the success of the store, a strong incentive for that employee to ensure the store's success arises. A store without fully-stocked shelves is less successful than one with fully-stocked shelves, so the exempt employee is forced to stock

shelves herself to ensure her store's success and her increased compensation. In this way, Dollar General coerces "exempt" employees to make up for the labor budget hour shortfall by doing the work themselves, and thereby keeps its costs down while maximizing its own profit. According to Carlisle, that exempt employee's performance of manual labor – stocking shelves, unloading trucks – is thus most important to the success of the company. Given this, a reasonable jury could find that Carlisle's managerial duties, while clearly important, were not more important than her nonmanagerial duties.

*2. Discretionary Powers*

Dolgencorp catalogues the areas in which Carlisle exercised discretion and argues that these facts clearly show that she exercised her discretion on a daily basis. The short list includes such tasks as evaluating job applications, selecting candidates to interview, conducting interviews, making hiring and termination recommendations to her DM, evaluating her employees' and store's performance, managing inventory levels, supervising the ordering of merchandise in her store, training employees, apportioning work, and scheduling employees. However, the undisputed evidence also reveals a number of decisions about Carlisle's store that were frequently made by Carlisle's DM. Dolgencorp argues that these "could nots" are "immaterial and irrelevant to the relative level of discretion that [Carlisle] did exercise." Yet "relative" implies a comparison, and without considering the evidence about decisions outside Carlisle's discretion, the Court is unable to assess her "relative level of discretion" at all. This "could not" evidence establishes the following:

- No employee could be hired or terminated without district manager approval.
- The district manager always had to approve write-ups of store employees.

- Carlisle had to get the district manager's approval before she began accepting applications from job applicants.
- Before an employee was hired, the district manager had to know why Carlisle wanted him or her hired and what job he or she would be doing if hired.
- The district manager gave the okay on who could be hired, how many people could be hired, and what their pay rates would be.
- When an employee was injured in the store, Carlisle had to contact the corporate office and they told her what paperwork to fill out.
- Dollar General guidelines dictated what merchandise to stock first when it came off the delivery truck and the timeline – "door to floor in twenty-four."
- Carlisle did not control the amount of merchandise left by vendors.
- All mark downs of damaged merchandise had to be approved by the district manager. For example, when merchandise was damaged due to a leaky roof, it was the district manager that authorized the merchandise be marked down.
- If there was an issue in the store concerning FMLA leave, Carlisle would call the district manager and he would tell her what to do.
- Carlisle did not make recommendations concerning a new employee's starting rate of pay, as all employees began earning minimum wage.
- Before an employee was promoted, the district manager's approval was required.
- While verbal counseling was permitted with DM approval, Carlisle could not counsel someone in writing without district manager approval.
- There were occasions when Carlisle had to have store schedules approved by the district manager.
- There was a time when the DM dictated where money should be stored in the building.
- The district manager dictated the store's labor budget and communicated that to the store.
- Carlisle had to have district manager approval before she could use her vacation time.

- Part-time employees were only allowed to work a certain number of hours, and if they were scheduled to work more than that set amount, the district manager's approval was required.
- Before closing the store for whatever reason, the district manager's approval was required.
- There were occasions when Carlisle recommended that the store be closed early due to bad weather, but the district manager refused to allow the store to be closed.
- The district manager was in charge of putting the store's management team in place.
- Carlisle called the DM when she had problems inside the building such as air condition problems, plumbing problems, or a leaky roof.
- Carlisle lacked the authority to transfer merchandise to or from the store to another store.
- Carlisle did not have any input over the store's hours of operation or thermostat temperature.
- All merchandise the store sold was preselected by Dollar General.

This evidence undercuts Dolgencorp's contention that Carlisle exercised a sufficient amount of discretion frequently and greatly undermines Dolgencorp's argument that Carlisle's primary duty was management.

*3. Freedom from Supervision*[8]

With respect to Carlisle's relative freedom from supervision, the evidence is refreshingly clear. Carlisle was the only manager in her store on a daily basis and her DM was rarely in her store. Her DMs visited her store for short amounts of time and sometimes as infrequently as once every other month. In fact, the amount of time Carlisle interacted in person with her DM was between one and two hours a month, and she spoke with him or her on the telephone approximately thirty minutes per week.

While Carlisle correctly argues that Dolgencorp mistakenly equates physical presence with supervision, she identifies little evidence to show other ways in which she was supervised because she equates instructions with supervision. For example, she argues that the planograms and monthly planners are evidence of Dolgencorp's "supervision" of her by making decisions for her. These directives do attempt to make Carlisle's decisions for her, and in that way they strip her of discretion, but the directives themselves do nothing to ensure enforcement. This is where "supervision" would come in. It is not clear that Carlisle was subjected to much of this kind of supervision at all. Short monthly visits hardly ensure that company policies are being carried out on a daily basis. Therefore, this factor, at least without more evidence about how Dolgencorp ensured that its policies were being enforced, weighs in favor of Dolgencorp.

---

[8] Carlisle argues that the discretion factor and the supervision factor should be analyzed together. While courts may often find facts that are relevant to one inquiry relevant to the other, it does not follow that, under the pre-amendment regulations, two factors that are clearly separately itemized should be collapsed into one. As Dolgencorp points out, "[w]hile an employee who is closely supervised may not regularly exercise[ ] discretion, it does not follow that non-supervisory 'limitations' on discretion mean that an employee is being closely supervised."

*4. Relative Wages*

Both Dolgencorp and Carlisle argue at length about the proper factors in this comparison and attempt to convince the Court with their own charts and figures. However, their arguments boil down to this: Dolgencorp contends that "the only reasonable inference is that a Store Manager's management of others and accountability for a store's overall operations were the reasons for substantially higher pay, while Carlisle asserts that any additional wages Carlisle received were because of the number of years she spent with the company – nineteen, to be exact. The argument about what the proper factors in the comparison are could go on for a long time, but one thing is clear. Assuming that Carlisle did earn "substantially more" than the other employees in her store, Dolgencorp has not established *why* she received more. At this stage and without more data, a reasonable jury could conclude that the majority of Carlisle's increased earnings are the result of her years with the company, and this conclusion would not support Dolgencorp's argument that Carlisle's primary duty was management.

*5. The Balance*

The evidence as a whole supports two reasonable, yet competing interpretations as to Carlisle's primary duty. A reasonable jury could be convinced by Dolgencorp's argument that a leaderless store can not function and when this evidence is combined with evidence about Carlisle's freedom from supervision and her increased wages, could find that Carlisle's primary duty was management. However, a reasonable jury could also find that management is not her primary duty because it was convinced that Dollar General's low price business model renders Carlisle's manual labor most important, the amount of discretion *not* afforded Carlisle indicates a relative lack of discretion, and Carlisle was paid more because of her years of experience with

the company. Because a reasonable jury could find that Carlisle's primary duty was not management, Dolgencorp is not entitled to summary judgment.

## IV. CONCLUSION

For the foregoing reasons, Defendant Dolgencorp Inc.'s motion for summary judgment is **DENIED**.

SO ORDERED: 05/09/2012

Hon. William T. Lawrence, Judge
United States District Court
Southern District of Indiana

Copies to all counsel of record via electronic communication.